**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CESAR SALINAS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** 4:22-cv-837 |
| | § | |
| | § | |
| **STEVE LOUD, and** | § | |
| **TERESA TORRES,** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, Cesar Salinas, complaining of Steven Loud and Teresa Torres, and for causes of action will respectfully show unto the Court as follows:

> "[A] constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest."

*Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir. 2018).

## SUMMARY

On September 20, 2020, Defendant Teresa Torres and Defendant Steve Loud, officers with the Fort Worth Police Department, violently slammed Plaintiff Cesar Salinas face first into the pavement causing immediate injuries to his face. At the time, Mr. Salinas had not been told he was detained or under arrest and had complied with the request to hand over his identification as the officers investigated a misdemeanor crime which Mr. Salinas had not been identified as the culprit and the criminal charges were later dismissed. Defendant Torres asked Mr. Salinas for his name. Mr. Salinas directed Defendant Torres to his identification which he had already handed Defendant Loud. This apparently upset Defendant Torres, as without warning, Defendant Torres then grabbed Mr. Salinas' phone in his hand and swung Mr. Salinas to his right. Defendant Loud then grabbed ahold of Mr. Salinas' other arm and the two officers violently slammed Mr. Salinas's face into the pavement causing immediate injuries. Mr. Salinas now files this lawsuit for violation of his right to be free from unreasonable seizures by way of excessive force under the Fourth Amendment to the United States Constitution.

## I.
## PARTIES

1.      Plaintiff Cesar Salinas is a resident of Denton County, Texas.

2.      Defendant Steve Loud hereinafter ("Defendant Loud" or "Loud") is an individual residing in Tarrant County, Texas and is a police officer with the City of Fort Worth Police Department and may be served at his place of employment at the City of Fort Worth Police Department located at 505 W. Felix, Fort Worth, TX 76115, or wherever he may be found. Defendant Loud is being sued in his individual capacity.

3.     Defendant Teresa Torres hereinafter ("Defendant Torres" or "Torres") is an individual residing in Tarrant County, Texas and is a police officer with the City of Fort Worth Police Department and may be served at her place of employment at the City of Fort Worth Police Department located at 505 W. Felix, Fort Worth, TX 76115, or wherever she may be found. Defendant Torres is being sued in her individual capacity.

## II.
## JURISDICTION AND VENUE

4.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

5.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendants reside in the Northern District of Texas and all of the causes of action accrued in the Northern District of Texas.

## III.
## FACTS AND ALLEGATIONS

6.     On September 20, 2020, Defendant Officers Steve Loud and Teresa Torres made contact with Plaintiff Cesar Salinas while investigating a complaint made by a female that she was groped by an unknown Hispanic male outside of a bar.

7.     Plaintiff Cesar Salinas was at a bar in downtown Fort Worth playing pool.

8.     Mr. Salinas went outside of the bar to smoke from his electronic cigarette.

9.     Defendant Loud came up behind Mr. Salinas and asked to speak with him.

10.     Mr. Salinas had not been identified by anyone as being the person who groped the female.

11.     At no point did the female identify Mr. Salinas as the person who grabbed her, and the charges related to this accusation were subsequently dismissed.

12.     At no point did Defendant Loud tell Mr. Salinas he was under arrest or being detained.

13.     Mr. Salinas pulled out his phone and called his friend who was inside the bar as he was alarmed at being suddenly accosted by Defendant Loud.

14.     Defendant Loud asked for Mr. Salinas' identification.

15.     Mr. Salinas complied by pulling his identification out of his wallet and handing it to Defendant Loud without any sort of refusal or complaint.

16.     Defendant Loud asked Mr. Salinas to walk over to a police car.

17.     Again, Defendant Loud had not informed Mr. Salinas of why he was speaking with him, why he needed to turn over his identification which he already done, why he was being asked to go to a police car, or that he was being detained or arrested.

18.     Mr. Salinas stated that he did not need to walk over to the police car as he was confused why he had been suddenly approached and questioned by a police officer, since he had just exited a bar to smoke his electronic cigarette and had already complied with the request to hand over his identification.

19.     Mr. Salinas told Defendant Loud that he would stand right where they were and wait, giving no indication he was going to flee, especially since Defendant Loud had his identification.

20.     Mr. Salinas asked Defendant Loud why he needed to walk to the police car and Defendant Loud told him he would explain when they got there.

21.     Mr. Salinas still had not been told why Defendant Loud was talking to him or had requested his identification, which Mr. Salinas complied with handing over.

22.     Mr. Salinas told Defendant Loud that Defendant Loud had initially told him to stay where he was at on the sidewalk and that was what he was going to do, adding "I'm not even running, I'm not even resisting."

23.     Defendant Loud did not repeat his request to walk to the police car and appeared content with Mr. Salinas standing where he was on the sidewalk.

24.     Defendant Loud still had not informed Mr. Salinas that he was being detained, arrested, or even the reason for his contact.

25.     Still, Mr. Salinas had complied with the request to hand over his identification and was waiting as instructed.

26.     Defendant Officer Torres then approached.

27.     <u>Defendant Loud told Defendant Torres that either Mr. Salinas or another male had groped a female but that the female had not identified who it was at that point</u>.

28.     Defendant Loud then told Defendant Torres that Mr. Salinas was refusing to go be identified, which was not true.

29.     At no time was Mr. Salinas ever told what was going on and was only <u>asked</u> to go to a police car without any explanation, which he declined to do.

30.     At no time was Mr. Salinas ever told what was going on and was simply asked to hand over his identification and wait on the sidewalk, which he did.

31.     As Mr. Salinas had not been told he was detained or under arrest and only that Defendant Loud wanted to talk to him, he had no reason to believe he had to walk over to a police car given that he was complying with the officer by turning over his identification.

32.     Mr. Salinas remained on the phone attempting to contact his friend.

33.     Defendant Torres approached Mr. Salinas and tapped him on the shoulder.

34.    Defendant Torres did not tell Mr. Salinas he was being detained, he was under arrest, or give any other indication why she was contacting him.

35.    Defendant Torres asked for Mr. Salinas for his name.

36.    Mr. Salinas told Defendant Torres that he had just given Officer Loud his identification out of his wallet.

37.    Mr. Salinas was standing stationary giving no indication he would flee.

38.    Mr. Salinas was not holding a weapon and gave no indication he was going to use a weapon.

39.    Mr. Salinas was not resisting as he had already complied with the request to turn over his identification and was simply standing still while holding his phone to his ear attempting to talk to his friend.

40.    Mr. Salinas had not been told by Defendant Loud, Defendant Torres, or any other law enforcement officer that he was being detained, that he was under arrest, or the reason for this police contact.

41.    By law, this was simply a consensual encounter which Mr. Salinas had not been told he was unable to terminate if he so chose.

42.    Mr. Salinas was standing with his right hand holding his cell phone up to his ear as can be seen from the screenshot of Defendant Loud's bodycam footage at the 1:29 mark below.



43.     Defendant Torres then stated, "I'm taking over," and grabbed Mr. Salinas' phone without explanation or warning, as can be seen on Defendant Loud's bodycam footage just frames later at the 06:59:06 mark of the video below. Mr. Salinas's hand holding his phone to his ear is identified with a green arrow and Defendant Torres' hand grabbing the phone without warning is identified with a red arrow.



44.     Without explanation or warning, Defendant Torres then immediately yanked the phone backwards pulling it away from Mr. Salinas' ear, as can be depicted in the below screenshot from Defendant Loud's bodycam footage just frames later at the 06:59:07 mark of the video. The screenshot shows Mr. Salinas' arm bending backward and the phone being pulled away from his ear, revealing his ear which was previously hidden from view by the phone in the screenshot described in paragraph 43, *supra*.



45.     Defendant Torres repeatedly asked Mr. Salinas "what is your name?"

46.     However, as Mr. Salinas had not been told he was being detained, had not been told he was under arrest, and had not even been told why he was being contacted by the police this was still legally a consensual encounter which did not require Mr. Salinas to identify himself to Defendant Torres.

47.     Despite that fact, Mr. Salinas had already handed his identification over to Defendant Loud and communicated that to Defendant Torres.

48.     Defendant Torres continued to pull Mr. Salinas' phone without explanation.

49.     Defendant Torres did not give Mr. Salinas any commands to drop his phone, let go of his phone, or to put his hands behind his back.

50.     Defendant Torres simply said "stop, stop" when Mr. Salinas was merely standing holding his phone in his right hand and his electronic cigarette in his left hand.

51.     Below is a screen capture of Defendant Torres grabbing for Mr. Salinas' phone in his right hand while he held his electronic cigarette in his left hand as Mr. Salinas points out what is happening to Defendant Loud.



52.     Without giving Mr. Salinas any further commands with which he could comply or even asking Mr. Salinas to hand over his phone, Defendant Torres then swung Mr. Salinas to his right in a spinning motion.

53.     When Defendant Torres grabbed Mr. Salinas' phone, yanked it backwards, and then spun Mr. Salinas around, (1) Mr. Salinas had not been identified as the person who had committed any crime, (2) Mr. Salinas had not been told he was being detained, (3) Mr. Salinas had not been told he was under arrest, (4) Mr. Salinas had complied with a request to hand over his identification despite this simply being a consensual encounter, (5) Mr. Salinas was not holding a weapon, (6) Mr. Salinas was standing stationary giving no indication he was going to flee, (7) Mr. Salinas was not acting aggressively or presenting a threat as he was simply standing stationary talking on his cell phone after handing over his identification, and (8) Mr. Salinas was not actively resisting arrest and was not even passively resisting arrest as he was simply holding onto his phone when Defendant Torres without warning grabbed it without giving any commands to drop or hand over the phone and without telling Mr. Salinas to put his hands behind his back or that he was being detained or arrested.

54.     Below is a screenshot from Defendant Loud's bodycam video showing Defendant Torres swinging Mr. Salinas to his right by his arm. Mr. Salinas' arm can be seen outstretched as Defendant Torres is holding it and pulling. Mr. Salinas' outstretched arm which is being yanked and swung by Defendant Torres is identified with a green arrow.



55.     Mr. Salinas never pulled his arm away from Defendant Torres but simply maintained his balance after he was slung without warning or explanation and without being given any commands to comply with or being told he was detained or under arrest.

56.     Defendant Loud then grabbed Mr. Salinas' left hand and arm.

57.     Defendants Torres and Loud maintained a grip on Mr. Salinas' arms.

58.     Mr. Salinas never pulled away from Defendant Torres or Defendant Loud.

59.     Neither Defendant Torres nor Defendant Loud gave Mr. Salinas an order to put his hands behind his back, to get down, to drop his phone, or any other order for him to comply other than simply saying "stop."

60.     Mr. Salinas responded that he wasn't doing anything as all he had done was maintain his balance so as not to be thrown face first into the ground when he had not been given any commands to comply with or been told he was detained, under arrest, or even the reason the police were talking to him.

61.     Defendants Loud and Torres then slammed Mr. Salinas face first into the ground, causing Mr. Torres' face to strike the hard pavement.

62.     Below is a screen capture of Mr. Salinas face down on the hard pavement.



63.     Officer Loud taunted, "that's what we're going to do, you hear me," after the Defendants slammed Mr. Salinas face first on the ground, despite never telling Mr. Salinas he was detained, under arrest, the reason for the contact, or that he needed to place his hands behind his back or hand over his phone.

64.     Mr. Salinas' face began bleeding as a result of the Defendants slamming him face first into the pavement.

65.     Defendant Torres placed a spit mask over Mr. Salinas' face as he began to bleed heavily.

66.     Below is a screen capture of Mr. Salinas bleeding heavily with a spit mask placed over his face.



67.     Defendants slammed Mr. Salinas to the ground so hard that his hat was knocked off his head.

68.     Defendants slammed Mr. Salinas to the ground so hard that the bright green pocketknife which had remained closed in his pocket became dislodged and flew out on the ground.

69.     Below is a picture of Mr. Salinas' hat and bright green pocketknife on the ground.



70.     While on the ground, Mr. Salinas told the Defendants that he had a vape.

71.     One officer asked, "What's he got in his hand."

72.     Another officer responded, "Is that a vape."

73.     Another officer answered, "I don't know."

74.     The presence of a pocketknife was not mentioned by Defendant Loud until Mr. Salinas was placed in the back of a police vehicle approximately four minutes and thirty seconds after Mr. Salinas was slammed on the ground by both of the Defendants.

75.     At no point prior to Mr. Salinas being placed in a police vehicle did Defendant Loud or any other officer mention the presence of a knife.

76.     Defendant Loud did not draw attention to the presence of a potential weapon until approximately four minutes and thirty seconds after Mr. Salinas had been slammed on the ground.

77.     When Defendants slammed Mr. Salinas face first on the ground, he was only suspected of non-violent misdemeanor offense which he had not even been identified as being the culprit.

78.     At no point prior to being slammed face first on the ground did Defendant Torres or Defendant Loud inform Mr. Salinas he was being detained or under arrest.

79.     When Defendants slammed Mr. Salinas face first on the ground, Mr. Salinas was not evading arrest as he had provided identification upon request and did not make any motions indicating an attempted to escape as he simply stood with his phone in one hand and his electronic cigarette in his other hand.

80.     When Defendants slammed Mr. Salinas face first on the ground, this was a consensual encounter as Defendants never informed Mr. Salinas he was under arrest or being detained.

81.     When Defendants slammed Mr. Salinas face first on the ground, Mr. Salinas was not actively resisting as he did not even attempt to pull his arm away from Defendant Torres or Defendant Loud.

82.     When Defendants slammed Mr. Salinas face first on the ground, Mr. Salinas was not a danger to Defendant Torres, Defendant Loud, or any other person as Mr. Salinas never raised his voice nor made any verbal threats toward Defendant Torres or any other person and was not holding a weapon as he had his phone in one hand raised to his ear as he was speaking on it and his electronic cigarette in his other hand.

83.     Defendant Torres fabricated a version of events in her offense report in order to justify her illegal use of force against Mr. Salinas.

84.     A screen capture of the incident report is included below.

85.     Defendant Torres stated in her incident report that "Officer Loud was able to grab [Mr. Salinas'] left hand and arm to conduct an arm bar take down, causing Cesar's face to hit the cement sidewalk. Officer Loud observed a folding knife in [Mr. Salinas'] left hand, which was still folded. "

> I asked Cesar what his name was and he refused to answer and ignored me. I pulled out my handcuffs to place Cesar under arrest for the indecent assault. I grabbed Cesar's right hand to place the handcuffs on him and he pulled away, and intentionally stiffened his arm up. I told Cesar to stop, at least two times, and Officer Loud was able to grab Cesar's left hand and arm to conduct an arm bar take down, causing Cesar's face to hit the cement sidewalk. Officer Loud observed a folding knife in Cesar's left hand, which was still folded. Once Cesar was on the ground, we were able to place him in handcuffs.

86.     Contrary to what Defendant Torres wrote in her report, the presence of a pocketknife was not mentioned by Officer Loud until approximately four minutes and thirty seconds after Defendant Torres slammed Mr. Salinas on the ground.[1]

87.     Contrary to what Defendant Torres wrote in her report, Mr. Salinas was not holding his green pocketknife in his hand, but rather, it was in his pocket and unobservable by either Defendant Torres or Defendant Loud, as can be seen by Officer Loud's bodycam footage.

88.     Contrary to what Defendant Torres wrote in her report, the screen capture below from Officer Loud's bodycam footage clearly shows that Mr. Salinas only held his black and pink electronic cigarette and cellphone in his hands prior to and at the time when Defendant Torres slammed Mr. Salinas on the ground.

---

[1] Defendant Torres even acknowledged in the incident report that the pocketknife was still folded at the time it was observed.



89.     As a result of being slammed onto the ground, Mr. Salinas suffered physical injuries, and physical pain and suffering including a laceration to his lip resulting in extensive bleeding, a contusion to his left cheek, a knot above his left eyebrow, and swelling on his head.

90.     Defendant Torres and Defendant Loud were at all times acting under the color of law.

## IV.
## CAUSES OF ACTION

**Count One**
**Excessive Force**
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendants Torres and Loud**

91.     Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

92.     Acting under the color of law, Defendants Torres and Loud deprived Mr. Salinas of the rights and privileges secured to him by the Fourth and Fourteenth Amendments to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable seizures by the use of force.

93.     Plaintiff brings this cause of action pursuant to 42 U.S.C. § 1983.

94.     The amount of force used by Defendants Torres and Loud against Mr. Salinas as described above, specifically but not limited to, when Defendant Torres and Loud both slammed Mr. Salinas face first into the pavement was objectively unreasonable under the circumstances and inflicted unnecessary injury, pain, and suffering upon Mr. Salinas.

95.     A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

*96.*     A constitutional violation occurs when an officer tases, strikes, or **violently slams an arrestee who is not actively resisting arrest**. *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir. 2018) (emphasis added).

97.     Fifth Circuit case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced. *Id.*

98.    Fifth Circuit case law also makes clear that it is objectively unreasonable for an officer to slam an arrestee's face when the arrestee "was not resisting arrest or attempting to flee." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008).

99.    Additionally, Fifth Circuit case law is clear that an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased. *Lytle v Bexar Cty., Tex..*, 560 F.3d 404, 413 (5th Cir. 2009).

100.    Although officers may need to use "physical force … to effectuate [a] suspect's compliance" when he refuses to comply with commands during a traffic stop, the officers still must assess "the relationship between the need and the amount of force used." *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2002); quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

101.    Where an individual's conduct amounts to mere "passive resistance," use of force is not justified. *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) (finding that the plaintiff pulling his arm away from officers amounted to only passive resistance and did not justify the use of force against plaintiff); see also *Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017) (determining the plaintiff's initial refusals to follow a police officer's instructions amounted to, "at most, passive resistance" and did not justify the officers use of a " 'half spear' takedown" against the plaintiff); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (plaintiff pulling arm away from an officer after the officer grabbed the plaintiff's arm was only minimal resistance, if at all, and did not justify two officers tackling the plaintiff).

102.    Mr. Salinas was not suspected of committing a felony offense when Defendant Torres slammed him face first into the pavement.

103.    When Defendants slammed Mr. Salinas face first on the ground, he was only suspected of non-violent misdemeanor offense which he had not even been identified as being the culprit.

104.    As Mr. Salinas was only suspected of a minor offense this "militates" against the use of force. *Trammell*, 868 F.3d 332 at 340 citing *Reyes v. Bridgwater*, 362 Fed.Appx. 403, 407 n.5 (5th Cir. 2010) (finding the "severity" factor from Graham "militated" against a use of force where the alleged crime was a misdemeanor).

105.    At no point prior to being slammed face first on the ground did Defendant Torres or Defendant Loud inform Mr. Salinas he was being detained or under arrest.

106.    When Defendants slammed Mr. Salinas face first on the ground, Mr. Salinas was not evading arrest as he had provided identification upon request and did not make any motions indicating an attempted to escape as he simply stood with his phone in one hand and his electronic cigarette in his other hand.

107.    When Defendants slammed Mr. Salinas face first on the ground, Mr. Salinas was not actively resisting as he did not even attempt to pull his arm away from Defendant Torres or Defendant Loud.

108.    When Defendants slammed Mr. Salinas face first on the ground, Mr. Salinas was not a danger or threat to Defendant Torres, Defendant Loud, or any other person as Mr. Salinas never raised his voice nor made any verbal threats toward Defendant Torres or any other person and was not holding a weapon as he had his phone in one hand raised to his ear as he was speaking on it and his electronic cigarette in his other hand.

109.    Mr. Salinas was not actively resisting arrest prior to when Defendant Torres slammed him to the ground.

110.    In *Trammel*, the Fifth Circuit found there was a factual dispute as to whether Trammel was actively resisting arrest throughout his encounter with the police.

111.    According to the Court in *Tramme*l,

Officers may consider a suspect's refusal to comply with instructions ... in assessing whether physical force is needed to effectuate the suspect's compliance. However, officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.' *Id.* (citations omitted) (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). For instance, where an individual's conduct amounts to mere "passive resistance," use of force is not justified. (quoting *Hanks*, 853 F.3d at 746 (determining the plaintiff's initial refusals to follow a police officer's instructions amounted to, "at most, passive resistance" and did not justify the officers use of a half spear' takedown" against the plaintiff)); (quoting *Deville*, 567 F.3d at 168 (the plaintiff's refusal to get out of her car before her husband arrived on the scene constituted passive resistance)).

*Trammel*, 868 F.3d at 341.

112.    In *Trammel*, the Court went on to discuss *Goodson*, a Fifth Circuit case where two police officers stopped an individual believing he matched the description of an individual suspected of assault. *Goodson*, 202 F.3d 730 at 733.

113.    In *Goodson*, one of the officers instructed the plaintiff to "put his hands on the [police] car." *Id.* at 734.

114.    The plaintiff in *Goodson* claimed that before he could comply the officer grabbed his arm. *Id.*

115.    The plaintiff stated, "he pulled his arm away from [the officer] in surprise and stumbled back in an attempt to regain his balance and maintain a little distance from the police officers." *Id.*

116.    Thereafter, the plaintiff claimed the two officers tackled him to the ground. *Id.*

117.    In reversing the district court's summary judgment based on qualified immunity, the Fifth Circuit held a fact question "existed as to the objective reasonableness of the force used" under the circumstances. *Id.* at 740.

118.    Significantly, the Court did not describe the plaintiff's decision to pull his arm away from the officers as resistance. *Id.*

119.    And given the officers lacked reasonable suspicion to detain or frisk the plaintiff and that the plaintiff was not fleeing, the Court declined to conclude that the plaintiff's decision to pull away from the officers justified the amount of force used. *Id.*

120.    In *Trammel*, the Fifth Circuit explained,

Just as in *Goodson*, it appears that Trammel's only physical resistance prior to being tackled was his attempt to pull his arm away. In fact, the dash cam footage reveals that Trammel did not even use much force in pulling away from the officers; although Trammel can clearly be seen moving his arm in the opposite direction from Officer Fruge, he is only able to move it away by a few inches such that the officer's hand never lost contact with Trammel's arm. It also appears that Officer Fruge himself was not pulled forward. Trammel was neither aggressive nor violent toward the officers prior to being tackled. As discussed above, Trammel was suspected of only a minor offense, and there was little indication he would flee. It is also unclear

whether a reasonable officer would have thought that Trammel posed a danger to himself and others. Thus, as in *Goodson*, we conclude that a reasonable jury could conclude that the officers' use of force was clearly excessive to the circumstances.

*Trammel*, 868 F. 3d at 342.

121.    The Fifth Circuit continued in *Trammel* by stating,

[M]oreover, even if Trammel's decision to pull his arm away from the officers can be characterized as some degree of resistance that would justify an officer's use of force, the quickness with which the officers resorted to tackling Trammel to the ground militates against a finding of reasonableness. This Court has several times found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need. (quoting *Newman*, 703 F.3d at 763 ((holding that disputes of fact were material because "a reasonable jury could find that the degree of force used was not justified where the officer 'engaged in very little, if any, negotiation' with the suspect and 'instead quickly resorted to' " force)); quoting *Deville*, 567 F.3d at 168 (determining that '[a] reasonable jury could infer from [the plaintiff's] deposition testimony that [the defendant officer] engaged in very little, if any, negotiation with [the plaintiff]—and find that he instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle")

*Id.* at 342.

122.    The Fifth Circuit in Trammel continued by stating,

Given that only three seconds elapsed between Officer Fruge's initial request that Trammel place his hands behind his back and when Officers Fruge, Garza, and Neveu tackled Trammel, we find that a reasonable jury could infer that the officers used very little, if any, negotiation before resorting to physical violence, and that the officers' conduct did not constitute the required "measured and ascending" actions calibrated to Trammel's conduct. Poole, 691 F.3d at 629 (quoting *Galvan v. City of San Antonio,* 435 Fed.Appx. 309, 311 (5th Cir. 2010)). Accordingly, we hold that a reasonable jury could find that Trammel's pulling his arms away from the officers, along with the other circumstances of Trammel's arrest, did not justify the officers' decision to tackle Trammel to the ground. Thus, there is a genuine dispute of material fact as to whether the officers' use of force was objectively unreasonable.

*Id.* at 342.

123.    Here, as depicted in Defendant Loud's bodycam footage, there is less resistance than was even found in *Trammel* and *Goodson*, as Mr. Salinas' did not even attempt to pull his arms away from Defenant Torres or Defendant Loud prior to being slammed face first into the pavement. *Trammel*, 868 F.3d at 331; *Goodson*, 202 F.3d at 734.

124.    A reasonable officer would know that the use of force is <u>clearly excessive</u> when engaging with citizens such as Mr. Salinas who was not threatening any officer or other person, was only suspected of a misdemeanor offense, was not attempting to flee, was at not actively resisting arrest, and who the use of force of being slammed on the ground was not warranted.

125.    A reasonable officer would know that the use of force is <u>clearly unreasonable</u> when engaging with citizens such as Mr. Salinas who was not threatening any officer or other person, was only being questioned about a misdemeanor offense, was not attempting to flee, was not actively resisting arrest, and who the use of force of being slammed into the ground was not warranted.

126.    A reasonable officer in Defendants' position would know that slamming Mr. Salinas to the ground was objectively unreasonable when Mr. Salinas was only being questioned about a misdemeanor offense, was not attempting to flee, was not actively resisting arrest is clearly unreasonable and excessive.

127.    As a direct result of the force used against him by Defendant Torres and Defendant Loud, Mr. Salinas has suffered physical injury, pain, and mental anguish for which he sues herein.

128.    These injuries were not caused by any other means.

**V.**
**<u>PUNITIVE DAMAGES</u>**

129.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

130.    When viewed objectively from the standpoint of Defendant Torres and Defendant Loud at the time of the occurrence, said Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

131.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendant Torres and Defendant Loud which was recklessly or

callously indifferent to Plaintiff's protected rights, Plaintiff is entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

132.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

133.    Plaintiff's injuries were a foreseeable event. Those injuries were directly and proximately caused by Defendant Torres and Defendant Loud both using excessive and unreasonable force against Plaintiff by slamming him face first into the pavement.

134.    As a result, Plaintiff is entitled to recover all actual damages allowed by law. Plaintiff contends said Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Plaintiff's legally protected rights. Thus, Plaintiff is entitled to punitive damages against Defendant Torres and Defendant Loud.

135.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Mr. Salinas was forced to suffer:

(a) Physical injuries, and (b) Physical pain and suffering.

136.    Pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff seeks to recover, and requests an award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

137.    If Plaintiff prevails in this action on claims pursuant to 42 U.S.C. § 1983, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. § 1988.

## VIII.
## JURY REQUEST

138.    Plaintiff respectfully requests a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which he may show himself justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

*/s/ Breanta Boss*
BREANTA BOSS,
Texas Bar No. 24115768

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com
breanta@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF